Evans, Respondent, vs. Evans, Appellant.

*October 20, 1920—January 11, 1921.*

*Mortgages: Deed as mortgage: Evidence: Sufficiency.*

In an action of ejectment brought by the plaintiff, holder of the legal title to a farm, against the defendant, who counterclaimed asking that the deed upon which plaintiff relied be declared a mortgage and for an accounting, the evidence of an experienced lawyer showing that he advised the plaintiff and her son (under whom the defendant claims) that an absolute deed given to secure a debt was in effect a mortgage; that the plaintiff said she wanted a deed, not a mortgage; and that the son said he would trust his mother, and that a deed was thereupon made, together with evidence to the effect that the farm conveyed was worth $16,000 and that the plaintiff had loaned her son $6,000 and had made admissions that she held the title of the land as security,—is *held* sufficient to establish that the deed was in fact a mortgage, the plaintiff making no effort to show what was the real consideration for the deed.

Appeal from a judgment of the circuit court for Dodge county: Martin L. Lueck, Circuit Judge. *Reversed.*

Ejectment. Defendant counterclaimed alleging that she is the owner of the land; prayed that the deed under which plaintiff claimed title be declared a mortgage, and for an accounting. The court found the title to be in the plaintiff, refused to declare the deed to her a mortgage, and refused an accounting. From a judgment entered accordingly the defendant appealed.

For the appellant there was a brief by *Healy & Healy* of Beaver Dam and *C. J. Laurisch* of Mankato, Minnesota, and oral argument by *Mr. John C. Healy* and *Mr. Laurisch.*

For the respondent there was a brief by *Brossard & Zeidler* of Columbus, and oral argument by *E. E. Brossard.* The following opinion was filed November 16, 1920:

VINJE, J.     Mindful of the rule that it requires clear, convincing, and satisfactory evidence to reform a written instrument, and of the further rule that findings of a trial court will not be set aside unless clearly against the preponderance of the evidence, we nevertheless in this case unanimously reach the conclusion that the trial court erred in not finding that the deed was in fact a mortgage and that an accounting should have been taken.     Plaintiff was the mother of defendant's husband, John Evans, who died in war service.     He had been married before, and Mr. Wilson, a lawyer residing at Mankato, Minnesota, and a witness in this case, had secured a divorce for him from his first wife. They had lived upon a farm belonging to his mother and John had not made a success of farming.     The result was that his mother had from time to time advanced money to him aggregating upwards of three or four thousand dollars. The evidence is vague and uncertain as to the amount.     The last time she helped him was when she signed a note for him for $400 to settle up his divorce suit.     The marriage of John to the defendant did not seem to please his mother; yet she was willing to help them get started on the land in question, which John had received by devise from his grandfather subject to a life estate in John's father, who was living at the time the deed in question was made.     The farm is worth about $16,000.     The deed was executed on the 11th day of September 1917, and Mr. Wilson, the lawyer who drew it, testified as to what occurred as follows:

"When they came in the office, John, in substance, said: 'Do you remember that $400 note mother signed with me, and I got the money from your bank?' and I says, 'Yes.' 'Well,' he says, 'she has arranged to let me have more money to buy stuff to go on the farm and she wants me to give her a deed to the farm in Wisconsin to secure the money

she loans me,' and I said, 'Well, why don't you give her a mortgage?' Then she spoke up and said, 'I don't want a mortgage, I want a deed, and whenever John pays me back I will deed the land back to him. John don't know how much it will be anyway. If he will give me a mortgage he will have to be giving other mortgages.' John said, 'What I want to know is whether, if I give her a deed, have I a right to get it back whenever I pay her,' and I said to that, 'Yes, if you give a deed to secure the money you borrowed, the legal effect of it is just the same as a mortgage.' 'Well,' he says, 'that is all I want to know; then you make your deed.' Then I said to *Mrs. Evans,* 'Do you want to give him a contract to convey it back?' She says, 'No, John can trust his mother. I will give it back to him whenever he pays up.' John says, 'Yes, I am not questioning my mother about giving it back, I know that she will do that. Further I wanted to know from you whether a deed is the same as a mortgage and whether I have a right to get it back when I pay up,' and then I prepared this deed. There was no money paid by *Mrs. Evans* to John at the time in my presence. I was interested in the bank to which I referred, which was the National Citizens' Bank of which I was director. I handed the deed to John. I don't know whether he did anything with it in my office or not. I later had a conversation with *Mrs. Evans* with reference to the transaction in the month of January, 1918. This conversation was at my office. It had reference to this deed. She said she had a letter from John; John wanted to know how to fill out his questionnaire in reference to this farm, and I said to her, 'Do you still have the title?' and she said 'Yes,' and I said, 'Did John ever pay you the money you loaned him, and for which you got as security the deed for this farm?' Then she said 'No.' Then I said, 'You should tell John that he should put down in the questionnaire that he owns this farm subject to the amount of money that he owes you.' I had a further talk with *Mrs. Evans* in the month of February, at the end of the month or the first of March, over the telephone. I recognized her voice, and she said to me, 'Have those Germans been to see you?' I said, 'What do you mean?' 'Well,' she said, 'I mean John's father-in-law.' 'Yes,' I said, 'he and John were here;' and she said, 'What did they want?' I said, 'They claim that you say that you would not give them the farm back now if

John pays you what he owes you.' 'Well,' she said, 'I hope you won't do anything for them.' I said to her, 'I could not handle their case for them if they had one.' I said, 'I do not understand the position you are taking, *Mrs. Evans;* you certainly know that this land was deeded to you to secure your loan to John, but it seems, too, you ought to give the farm back to John if he pays up.' 'Well,' she says, 'I am better able to take care of that farm than John is.' I think she said something about him going to the service, she did not know what would happen. I had a later talk with her, after John had gone into the service, with reference to the deed, over the telephone, in the month of November, 1919. She called up and she says, 'I understand you are working against me.' I said, 'No, *Mrs. Evans,* I don't know what you mean, I don't know that I am working against you.' She says, 'Are you going to be a witness in that case against me?' I said, 'I could not say that I am or am not, but I would naturally suppose that I would be.' Then I suggested to her again, 'I can't understand why you won't give up that farm if you get your money; you certainly know the way in which it was deeded to you.' 'Well,' she says, 'if John would come back I would just as soon turn it over to him; but,' she says, 'I am not going to give it to this woman.' When she referred to Germans I knew she referred to John's wife's people."

*Cross-examination:* "I practiced law twenty-three or four years. I am now in the Minnesota State Bank Building. Mr. Laurisch is in the National Citizens' State Bank Building across the street. Mr. Laurisch and I are not greater personal friends than other lawyers in the city of Mankato. I have been against him in about as many cases as I have been associated with him. When John came to my office about this case I told him I could not take his case. He did not tell me that his wife did not want him to go into the army. He did not come to have me assist him to get out of the army. I did not tell him to go to Mr. Laurisch or that I would be a better witness than lawyer. I remember what I told *Mrs. Evans* on the first hearing. My stenographer, Ethel Skuse, was not in the room when the deed was made, until the deed was prepared. She then took the acknowledgment. She prepared the deed on the machine and I sat there and told her what to write in. I told her to put in as consideration one dollar and other

valuable consideration.  I knew that John was owing his mother $400 upon a note which was not yet due.  It was a note that was given to pay alimony, at the bank of which I am a director.  I knew what the terms of the deed were, and I did not take John's case because I felt that in all probability I would have to be a witness.  I felt in fairness and justice to all the parties to the transaction that I should be a witness.  I did not mention Mr. Laurisch's name to him.  He suggested Mr. Laurisch when he could not get me.  His wife was not with him, his father-in-law was.  I did not actually know last November whether I would be a witness or not.  I naturally expected to be.  I was never advised that this case would be tried at New Ulm in 1919 and never heard anything about it.  I first learned that I would be a witness in this case about ten days ago.  I was asked to come here.  *Mrs. Evans* had a telephone conversation with me in March, 1918.  When John came first to me I did not remember that she told me that Mr. Laurisch had told John that if he owned the farm he now lives on he did not have to go to war.  That was the time she asked if the Germans had been to see me.  The only Germans was his father-in-law.  John was not a German.  I told her that I—as I did at other times—that I expected to be a witness.  I told her that so far as starting proceedings, I would not have anything to do with it—that I expected to be a witness.  John never asked me if he could not give his farm to his mother.  I understood that the personal property was used up to pay his debts.  I knew his mother had helped him.  I think I have made a warranty deed for property intended to be a mortgage without a contract to reconvey, during my career as a lawyer.  One instance was Mr. M. E. Babcock.  There was a contract to reconvey about seven or eight years ago.  John asked me if he could get it back if he paid.  The statement was made that *Mrs. Evans* was loaning more money that day.  Outside of that I did not know of any money that was owing.  I did not put in the amount of money in the deed there was already due and owing from John to his mother, as I did not understand they were deeding then, as she was going to loan him more money that day, so I did not think it necessary to make any such statement.  I did not know that it purported to be a gift.  I have plenty to do as a lawyer.  I have had other instances of this kind.  I don't know now for sure

as I can name them. At the time of the divorce John made no claim one way or another of owning this property. He was obtaining a divorce from his first wife and $400 was borrowed at the Citizens' National Bank, and his mother signed with him, in January, 1917. I think the note may become due the last days of July. Plaintiff's Exhibit 2 is not the note. It might be a renewal. I executed that mortgage or drew that deed September 11th. She gave another note on the same day that deed was given, for $560. That note has been paid, by *Mrs. Evans* about April 15th, as I understand, and I know it through the records in the bank. I have seen the note there and that it was paid, but the record nowhere shows who paid it. That $400 note which you have was for the debt for the note prior to that. I presume this is a renewal of it. I do not remember of John having any other notes at the bank. There was a $1,000 note, but my recollection is that *Mrs. Evans* signed that alone."

*Redirect examination:* "I was judge of probate in our court in 1898; from 1900 to 1906 I was prosecuting attorney. During the war I was connected with the Food Administration in Blue Earth county as the official food administrator in our county. I was a director in the Minnesota Commission of Public Safety and president of the Blue Earth County Safety Association, and director and representative of the War Industries Board. I knew the husband of *Jane A. Evans* in his lifetime."

*Recross examination:* "I came here to testify because I was asked to come. I was not subpœnaed. I live in another state. Nobody is running my business while I am away. I thought it was my duty to come."

We have set out the evidence of Mr. Wilson almost in full because his testimony is the turning point of the case and was evidently so considered by the trial court, for he says in his written opinion:

"The circumstances disclosed by the evidence, independent of the testimony of S. B. Wilson, relied upon by the defendant in support of her allegations, when considered in their most favorable light are no more persuasive than are those which point to the deed as expressing the real intent of the parties."

He then goes on to state why the testimony of Mr. Wilson does not satisfy the rule as to the character of evidence necessary to reform a deed. He says:

"The testimony of Mr. Wilson does not convince me that this deed ought to be transformed into a mortgage. He is a lawyer with a large practice. The rule of law herein stated as to the nature and weight of the evidence is as old as the practice of the courts of equity in reforming written instruments on the ground of mistake. Mr. Wilson was without doubt familiar with this rule of law and was aware of the difficulties likely to be encountered if an appeal had to be made to the courts to correct the instrument. His plain duty required that he draft the instrument so as to contain the entire agreement of the parties. There is no claim that a defeasance clause was inadvertently omitted; on the contrary it appears that it was done intentionally. It seems incredible that a lawyer with the experience of Mr. Wilson would have deliberately drafted and placed his name as subscribing witness to a deed, absolute in form, if the parties had told him that they merely desired something drawn that would make the land security for a loan. The evidence is not sufficient, in my opinion, to warrant the reformation of the deed."

It will thus be seen that the trial judge was influenced largely in reaching the result he did by what he regarded as an incredible, if not wholly unprofessional, act on the part of Mr. Wilson to draw a deed absolute that was intended as a mortgage. That such acts are occasionally done by reputable lawyers, the experience and observation of every Justice of this court affirms. Mr. Wilson explained fully the legal effect of their acts and suggested that the plaintiff should give a written contract to reconvey. She said the son could trust her and he said he could. What further was there to do than to allow the parties to have such a writing as they both agreed upon after its true effect was fully and correctly explained to them? There was a good reason why plaintiff wanted a deed instead of a mortgage. Her son had not shown himself to be either a

good business man or a good farmer.   The mother knew that, and so she said when Mr. Wilson suggested that a mortgage be given, "I don't want a mortgage, I want a deed; . . . . if he will give me a mortgage he will have to be giving other mortgages."   She wanted to put it out of her son's power to incumber the land to others, and this could be done by his deeding it to her.   That she was then sincere in intending to reconvey when she was repaid, or at least when she thought it was safe and prudent to re-invest him with the title, may be admitted.   Subsequent events no doubt changed her mind—especially the death of her son and the consequent passing of the title not only to strangers in blood but to one she disliked.   It is therefore because we are satisfied that the trial court applied a wrong test to the testimony of Mr. Wilson—looking upon the acts testified to by him as so unusual as to be practically incredible—that we the more readily set aside his findings.   To us the testimony of Mr. Wilson rings true.   An old, experienced lawyer, who, as the evidence shows, for nearly a quarter of a century has enjoyed the confidence of the people in the community in which he has lived, evidenced by the numerous offices of trust that he has held, and who has no interest in the result of the case, but who came to testify because, as he truly said, he regarded it as a matter of duty, would not be likely to perjure himself.   And what reputable lawyer would not testify under the same or similar circumstances?   Considering the contents and character of the evidence given by him, he could not be mistaken through forgetfulness.   His testimony is either true or false.   We think it true   We arrive at this conclusion both from the intrinsic character of the testimony and its consistency with what was probable under the circumstances.   Here was a young man, a farmer, just married, who had received from his grandfather land worth about $16,000.   His mother was well-to-do.   She had advanced him considerable sums of money.   She was going to advance him more.   He was not very thrifty and she feared he would incumber the land if he held

the title.   The son, upon being told that his mother could hold the title as security, consented to passing it to her.   He said he could trust her.   They did not know how much she would eventually have to loan him.   But whatever it might amount to, she held the deed as security for it.   That he should at the threshold of life, with a wife to support, absolutely give to his mother, who did not need it, all the property he owned, even if he had received upwards of $6,000 from her, seems incredible.   It would still constitute a gift of some eight or ten thousand dollars.   Sons are not and ought not to be so generous to their mother— especially just after marriage....

In view of the convincing and specific proof produced by the defendant, it was incumbent upon plaintiff to show just what the consideration of the deed was.   This she fails to do.   Her evidence is vague and evasive.   She stands upon the deed, but gives no satisfactory reason why a court of equity should permit her to stand there.   It is true that the son in his war questionnaire said that he had deeded the land to his mother, and another witness testified that he said the same thing to him.   And so he had; but the conditions under which the deed was given were not stated.   Later he sought to correct the questionnaire by showing such conditions.   On the other hand, there is the testimony of quite a number of witnesses that plaintiff had admitted at various times before the suit was begun that she held the title as security only.   But even if we assume, as the trial court did, that the evidence, aside from Mr. Wilson's testimony, is as persuasive for one party as the other, we think that his testimony unquestionably discloses where the truth lies and should decide the case.

*By the Court.*—Judgment reversed, and cause remanded with directions to declare the deed a mortgage, and to take an accounting as prayed for by the defendant.

The respondent moved for a rehearing.
In support of the motion there was a brief by *Brossard &*

*Zeidler* of Columbus, attorneys for the respondent, and
*Regan & Grogan* of Mankato, Minnesota, of counsel.

In opposition thereto there was a brief by *Healy & Healy*
of Beaver Dam and *C. J. Laurisch* of Mankato, Minnesota,
attorneys for the appellant.

The motion was denied, with $25 costs, on January 11,
1921.